UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

——

TIMOTHY MCCRARY,                          )
                                          )
                    Petitioner,           )        Case No. 4:03-cv-177
                                          )
v.                                        )        Honorable Wendell A. Miles
                                          )
JOHN CASON,                               )
                                          )        **REPORT AND RECOMMENDATION**
                    Respondent.           )
_____  )

       This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner is serving a term of 10-20 years and 40-60 months concurrently, imposed by the Wayne County Circuit Court on August 30, 2000, after a jury convicted Petitioner of one count of first-degree home invasion, and one count of aggravated stalking. In his *pro se* petition, Petitioner raises three grounds for relief, as follows:

I.      Judge Townsend improperly punished [Petitioner] for requesting a new lawyer by banning further plea negotiations and forcing a trial, then upon conviction handing down a sentence four times longer than the one [Petitioner] had been offered and tried to accept before trial. Judge Townsend thus deprived [Petitioner] of his Fourteenth Amendment right to due process of law.

II.     Judge Townsend erred by allowing the prosecution, over defense objection, to offer proof of acts that it had never notified [Petitioner] were part of the aggravated stalking charge he would face. [Petitioner] was thus depriv[ed] of his Sixth Amendment right to a fair notice of the charges against him and his Fourteenth Amendment right to due process of law.

III.    [Petitioner] was denied his right to due process of law guaranteed by the Fourteenth Amendment to the United States Constitution and his right to effective assistance of counsel and a fair trial, both guaranteed him by the Sixth Amendment to the United States Constitution, where his trial attorney fail[ed] to prepare and investigate.

Respondent has filed an answer to the petition (docket #12) stating that grounds I and II should be denied because they are procedurally defaulted and Petitioner has not shown cause or prejudice to overcome that default.  Respondent argues ground III has no merit.

Upon review and applying the AEDPA standards, I find that grounds one and two are procedurally barred, and ground three is without merit.  Accordingly, I recommend that the petition be denied.

## Procedural History

### A.    Trial Court Proceedings

The state prosecution arose from events that occurred in December 1999.  Complainant, Petitioner's estranged wife, alleged that on December 21, 1999, Petitioner broke into her house and attacked her.  Petitioner was charged with one count of home invasion, MICH. COMP. LAWS § 750.110a, one count of aggravated stalking, MICH. COMP. LAWS § 750.411i, and one count of felonious assault, MICH. COMP. LAWS § 750.82.  Following a preliminary examination on February 8, 2000, Petitioner was bound over on all three charges.  He was tried before a jury on August 9-10, 2000.

At a May 31, 2000 pretrial hearing, Petitioner told the court that he wanted a new attorney because he believed his counsel, Charles Noble, was not being honest with him.  (Mot. Tr., May 31, 2000, p 3, docket #19.)   Specifically, Petitioner reported to the court that Noble told him a 2½ to 5 year plea offer previously made by the prosecution was no longer available because the complainant would not agree to those terms.  (Mot. Tr., 3-4.)  When the court responded that Noble was not lying, because that is indeed what occurred, Petitioner stated that Noble was also withholding facts and discovery responses from him.  (Mot. Tr., 4-5.)  At this point, the trial court

stated, "let's not waste any time.  Mr. Noble is not going to be forced against his will to represent you.  I'm not going to be forced against my will to sit here and listen to this nonsense.  So, I'm going to permit him to withdraw from this case." (Mot. Tr., 5.)  Then, when Petitioner thanked the court, it responded, "[a]nd I'll remember you." (Mot. Tr., 5.)  After again stating that it did not want to "go through all this nonsense," (Mot. Tr., 6), the court stated that new counsel would be appointed for Petitioner  (Mot. Tr., 6).  The court added, "[t]here will be no offers," then asked the prosecutor, "[i]s that all right with you?" (Mot. Tr., 6.)  At the conclusion of the hearing, the court commented, "Now I understand why the complainant didn't want to go along with any offers." (Mot. Tr., 7.)  Attorney David Burgess was appointed to represent Petitioner, and represented him at trial and sentencing.

On the first day of trial, complainant testified as follows.  In December 1999, she and Petitioner were married but in the process of divorcing.  (Trial Tr. Vol. 1, August 9, 2000, pp 63-64, 119, docket #21.)[1]  Complainant had a personal order of protection against Petitioner at the time.  (Tr. 1, 64, 66, 69.)   She had instructed her two children, aged twelve and eight at the time, that if they ever saw Petitioner around complainant or at her house, they should call the police.  (Tr. 1, 65, 76.)[2]  Sometime in the first week of December 1999, complainant's telephone line was cut.  (Tr. 1, 68-71.)   Immediately after complainant discovered that her phone line had been cut, she saw Petitioner running near her house.  (Tr. 1, 68-71.)  Complainant further testified that in the first week in December 1999, she saw Petitioner break her car windows with a shovel.  (Tr. 1, 71-73.)  Petitioner's counsel objected to complainant's testimony regarding the phone line and car windows

---

[1] Complainant and Petitioner's divorce was final in May 2000.  (Tr. 1, 62-63, 119; Trial Tr. Vol. 2, August 10, 2000, p 87.)

[2] Petitioner is not the father of complainant's two children.  (Tr. 1, 65.)

because they did not occur on December 21, 1999.  (Tr. 1, 68-69.)  The court overruled the objection. (Tr. 1, 69.) Later in her testimony, complainant identified a receipt from Guardian Glass Company for repairs to her car windows.  (Tr. 1, 99.)

Complainant further testified that at early in the morning of December 21, 1999, she heard noises in her house. (Tr. 1, 75-77.) When she investigated at about 5:15 a.m., she encountered Petitioner in her house, who proceeded to punch and kick her. (Tr. 1, 78-80, 83-85.)  Complainant yelled Petitioner's name loudly, asking him what he was doing in the house, so that her children would know Petitioner was there.  (Tr. 1, 82.)  Petitioner then forced the complainant upstairs, holding a knife to her neck.  (Tr. 1, 86-88.)  He proceeded to rummage through her bedroom and take her pager. (Tr. 1, 89, 90.)  Complainant's two children were in the house at the time, and one of them called the police.  (Tr. 1, 85, 91.)  Petitioner pushed the complainant back downstairs.  (Tr. 1, 92.)  Police officers announced themselves at the door, and Petitioner pushed complainant to the floor, put the knife to her neck, and told the police he would kill complainant if the officers came in.  (Tr. 1, 93-95.)  The police then entered the house and Petitioner ran to the basement.  (Tr. 1, 95.) When the police entered the house, complainant was sitting on the couch, bleeding.  (Tr. 1, 95.) After Petitioner left the house, the police officer who was African-American brought a shoe upstairs from the basement.  (Tr. 1, 96-97.)  Complainant had seen the shoe under a basement window that had been "broke out."  (Tr. 1, 97-98.)  At trial complainant identified a shoe that looked like the one brought up from the basement, and which, she testified, was one of a pair that Petitioner had bought when they were first married.  (Tr. 1, 98.)  The space left in the broken window was big enough for a person to pass through it.  (Tr. 1, 97-98.)

Complainant further testified that after the police left, she went to the emergency room, where she received treatment for her bleeding eye. (Tr. 1, 100.) She subsequently went to an eye specialist every day for two months for treatment of her eye. (Tr. 1, 100-01.) Complainant's nose was also broken. (Tr. 1, 101.) She confirmed that two photographs proposed as prosecution exhibits were one that was taken of her at the hospital on December 21, and one that was taken of her later, after her injuries had healed. (Tr. 1, 102-03.)

On cross-examination, complainant testified that when she obtained an order of protection against Petitioner, she merely filled out some papers, and did not have to present any evidence. (Tr. 1, 107.) She testified that her telephone lines were cut five or six times, and that each time, she called the police and the telephone company. (Tr. 1, 107-08.) When defense counsel asked whether there was any documentation from the phone company to corroborate her testimony, complainant responded that she had taken all documents relating to the incidents to a domestic violence unit. (Tr. 1, 108.) Defense counsel cross-examined complainant regarding the presence of Petitioner's belongings at her house, implying that the shoe found on December 21 may have come into complainant's possession before she and Petitioner separated. (Tr 1, 109.) Defense counsel further cross-examined complainant regarding the size of the basement window through which Petitioner purportedly entered and exited her house (Tr. 1, 110-11); whether complainant had initiated any contacts with Petitioner (in apparent preparation for Petitioner's mother's testimony that complainant initiated contact) (Tr 1, 112-13); and how complainant could possibly see where Petitioner went when the police entered her house on December 21, given that she'd testified she was laying on the floor with an injured and bleeding eye. (Tr. 1, 116.)

On redirect, complainant clarified that she had contacted Petitioner's parents once, asking them to retrieve his possessions (Tr. 1, 120); and that Petitioner's brother called her once to warn her that Petitioner was trying to find the location of her new house.  (Tr. 1, 121.)

Complainant's seventh-grade daughter, Angelica Peguies, testified on direct examination as follows.  In December 1999, Peguies saw Petitioner break complainant's car windows while the car sat in complainant's driveway.  (Tr. 1, 124-26.)  In December 1999, Peguies also saw Petitioner walking in the alley and back yard of complainant's house, and saw him cut complainant's phone line.  (Tr. 1, 126-28.)  One morning in December 1999, close to Christmastime, Peguies was awakened by complainant screaming, "[Petitioner] is downstairs."  (Tr. 1, 129-30.)  When Peguies heard that, she pulled a cell phone out of complainant's dresser drawer and dialed 911.  (Tr. 1, 130-31.)  She and her brother then went down stairs and saw Petitioner hitting complainant in the eye with his fist.  (Tr. 1, 128-29, 133-34.)  Peguies and her brother went back upstairs, as did complainant and Petitioner.  (Tr. 1, 135-36.)  Petitioner was looking for complainant's cell phone, and took her pager.  (Tr. 1, 136-38.)  They all went downstairs, where Petitioner loudly inquired about his clothes, money, and car. (Tr. 1, 139.)  As police knocked on the door, Petitioner knelt on the floor, put his knife to complainant's neck, and said he'd kill complainant if the police came in.  (Tr. 1, 140.)  Peguies opened the door to let the police in.  (Tr. 1, 141.)  Petitioner ran to the basement and one of the officers chased after him.  (Tr. 1, 141-42.)  Complainant's eye and nose looked different.  (Tr. 1, 145.)

Defense counsel cross-examined Peguies regarding inconsistencies in her testimony.  (Tr. 1, 147-50.)  He asked her to reiterate her testimony regarding Petitioner's screaming inquiries about his clothes, money, and car during the December 21 incident.  (Tr. 1, 151.)  Counsel asked

whether the car complainant was driving had actually been purchased by and belonged to Petitioner. (Tr. 1, 151.)  Counsel asked whether there had been a board on the basement window Petitioner purportedly entered and exited through; Peguies stated there had been a board there before.  (Tr. 1, 152.)  Counsel asked whether Petitioner and complainant got along pretty well before the December 21, 1999 incident; Peguies answered that they had.  (Tr. 1, 152.)  Peguies also testified on cross that at another time, she had seen Petitioner outside complainant's house around 6:00 a.m. walking up and down the street.  (Tr. 1, 153.)

On redirect, Peguies testified that complainant had instructed Peguies to call 911 if anyone they didn't know bothered them.  (Tr. 1, 155.)  Peguies further testified that she was not to let Petitioner into complainant's house if she saw him.  (Tr. 1, 155.)  Peguies identified the shoe she saw in the basement on the floor after the December 21 incident as Petitioner's.  (Tr. 1, 155-56.)

Detroit Police Officer Carl Chuney testified that on December 21, 1999, at around 6:00 a.m., he and his partner Sam Serra received a radio notification of an assault and battery in progress. (Trial Tr. vol. 2, August 10, 2000, p 4, docket #22.)  When they arrived at complainant's house, they saw her on the front porch, upset, screaming that she had been attacked.  (Tr. 2, 4-5.)  Her eye was swollen. (Tr. 2, 5, 13.)  Complainant told Chuney and Serra that two other officers had been on the scene earlier that morning.  (Tr. 2, 5-6, 22-23.)  Neither Chuney nor Serra knew who those two officers were, nor was the fact that the two other officers had been there included in Chuney's and/or Serra's  report.  (Tr. 2, 6, 22-23.)  Complainant told the officers her husband, Timothy McCrary, had just attacked her, and gave the officers a description of him and two addresses where they might find him. (Tr. 2, 6-7, 26.)  Chuney and Serra searched the one-mile radius immediately surrounding complainant's house, then searched inside the house. (Tr. 2, 6-8.)

While searching complainant's house, Chuney noticed a gym shoe on a bed that was directly under a basement window that had been pushed through. (Tr. 2, 9-12.) Officer Serra's testimony mirrored that of Officer Chuney in all material respects. (Tr. 2, 22-29.)

Officer Serra additionally testified that complainant told him Petitioner struck her with a closed fist in the left forehead area, causing a laceration in her left eye area, which Serra noted was swollen. (Tr. 2, 24.) Serra testified that complainant had told him that she was "scared to death" and "wanted it all to . . . end." (Tr. 2, 26.)

Petitioner's counsel cross-examined Officers Chuney and Serra regarding the absence of any broken glass near the basement window Petitioner had purportedly broken to enter and exit complainant's house. (Tr. 2, 14-15.) He cross-examined Serra on the inconsistencies between his testimony and Chuney's. (Tr. 2, 28-29.)

Petitioner's mother, Dorothy McCrary, testified on Petitioner's behalf as follows. (Tr. 2, 31.) She recalls December 20-21, 1999 because December 21 is her birthday. (Tr. 2, 31.) Petitioner was at her house when she arrived home before 12:00 midnight on the night of December 20. (Tr. 2, 31.) When she got up at 5:00 a.m. on December 21, and then when she left her house at 6:00 a.m., Petitioner was still at her house, sleeping. (Tr. 2, 32.) If Petitioner had left her house while she was sleeping that night, the door would have been left open, as Petitioner did not have a key to reenter the house. (Tr. 2, 33.) A number of times before the December 21, 1999 incident, complainant called Petitioner, and would also show up at Petitioner's relatives' houses. (Tr. 2, 34-35.)

On cross-examination, Dorothy McCrary testified that complainant had in fact called her to discuss the need for Dorothy to pick up her belongings and Petitioner's belongings that had

- 8 -

been left at complainant's house.  (Tr. 2, 41-43, 45-46.)  Dorothy  confirmed that because she left

for work at 6:00 a.m. on December 21, 1999, she did not know Petitioner's whereabouts after that

time on that date.  (Tr. 2, 50-51.)  She also admitted that she did not know Petitioner's whereabouts

during the time she was sleeping on December 20-21.  (Tr. 2, 51-52.)  Dorothy further testified that

her house was six blocks from complainant's, a distance that could be walked.  (Tr. 2, 52.)

Petitioner's brother LaRon McCrary testified on Petitioner's behalf as follows.  (Tr.

2, 57-58.)  When he arrived home (to Dorothy McCrary's house) on December 20, 1999 at 11:30

p.m., Petitioner was there.  (Tr. 2, 58.)  LaRon and Petitioner stayed up until approximately 4:30 or

5:00 a.m. December 21 watching movies.  (Tr. 2, 58-59.)  Petitioner was asleep at about 2:00 a.m.

when LaRon left to go to the store.  (Tr. 2, 59.)  When LaRon woke up at about noon on December

21, Petitioner was still there, awake.  (Tr. 2, 60.)  In the time shortly before December 21, 1999,

complainant would spend time at Dorothy McCrary's house drinking with LaRon three or four times

per week. (Tr. 2, 60.)  Complainant told LaRon that she owed Petitioner money but did not want to

pay him.  (Tr. 2, 61-62.)

On cross-examination, LaRon testified that Dorothy McCrary could not have seen

Petitioner asleep at 11:30 p.m. on December 20, because Petitioner was awake until 4:30 or 5:00 the

next morning watching movies with LaRon.  (Tr. 2, 66, 68.)  LaRon admitted that because he went

to sleep at around 5:00 a.m. on December 21, he did not know Petitioner's precise whereabouts after

that time.  (Tr. 2, 70, 73.)  He testified that he and complainant were friends, and that his family

helped complainant from time to time despite her pending divorce from Petitioner; for example,

LaRon babysat her children on one occasion.  (Tr. 2, 71-73.)  LaRon further testified that

complainant asked LaRon not to tell Petitioner where she lived.  (Tr. 2, 73.)

- 9 -

Petitioner testified as follows. (Tr. 2, 76.) From approximately 10:00 p.m. on December 20, 1999 through the early morning of December 21, 1999, he was at his mother's house. (Tr. 2, 76.) He wears a size 10 shoe, and buys a size 10 and a half. (Tr. 2, 77-78.) He has never bought size 11 and a half shoes because that size is too big. (Tr. 2, 78.) He denied going to complainant's house in the early morning hours of December 21, 1999. (Tr. 2, 78.) Instead, he was at his mother's house between 3:00 a.m. and 6:00 a.m. on December 21 watching tv and movies; he woke up at his mother's house at about 9:00 a.m. (Tr. 2, 78.)

On cross-examination, Petitioner admitted that he was aware of the October 1999 Personal Order of Protection. (Tr. 2, 79.) He further admitted he wrote complainant letters after December 21, 1999 asking her to drop the criminal charges against him. (Tr. 2, 79-80, 85.) He admitted writing in a May 18, 2000 letter that if complainant dropped the criminal charges against him, he would sign their divorce papers. (Tr. 2, 85-86.) He admitted writing in an April 21, 2000 letter that every time complainant sent him to jail or had the police take him away, "it does something to [him]" and he keeps "coming back for more." (Tr. 2, 81-82.) He admitted writing in the April 21 letter that he would keep writing to complainant until she read his letters; that he didn't care what anyone said; and that she was still his wife. (Tr. 2, 82-84.) He admitted that after he and complainant separated, he knew where she worked, where she lived, and what kind of car she drove. (Tr. 2, 91-92.) He further admitted that he had always had a good relationship with Angelica Peguies and she therefore had no reason to lie when she testified at trial. (Tr. 2, 94-95.) In her cross-examination of Petitioner, the prosecutor placed the gym shoe officer Serra found at complainant's house next to Petitioner's foot and stated they were close in size; Petitioner disagreed

- 10 -

with her.  (Tr. 2, 95-96.)  Petitioner confirmed that his mother's house, where he was staying on

December 20-21, 1999, was within walking distance from complainant's house.  (Tr. 2, 96.)

On re-direct, Petitioner's attorney asked him to take one of his shoes off.  (Tr. 2, 105.)

The shoe Petitioner was wearing was size 10 and a half; the shoe presented in the courtroom was

size 11 and a half.  (Tr. 2, 105.)  On recross, the prosecutor asked Petitioner to place the two shoes

side by side; Petitioner refused; then his attorney told him he could.  (Tr. 2, 105.)

On second re-direct, Petitioner testified that he'd written letters to complainant

because she had tried to visit him while he was incarcerated, although she was not allowed to see

him. (Tr. 2, 106-07.)  He further testified that while he was married to complainant, her eye and jaw

had swollen a number of times as a result of airborne metal particles in the foundry where she

worked.  (Tr. 2, 110-11.)  The defense rested after Petitioner testified.  (Tr. 2, 114.)

Before the jury was instructed on August 10, 2000, Petitioner's counsel moved for

a directed verdict based on the prosecution's failure to make its case. (Tr. 2, 115-16.)  He based his

motion on the testimonial inconsistencies regarding glass and/or a board on the broken basement

window; and the absence of corroboration of complainant's testimony that Petitioner threatened her

with a knife.  (Tr. 2, 116-19.)  The trial court denied the motion.  (Tr. 2, 119-20.)

The court instructed the jury, excused them, and asked the parties for objections,

corrections, or additions to the instructions given.  (Tr. 2, 165.)  The court then asked Petitioner

whether he had any complaints against his attorney, David Burgess. (Tr. 2, 168.) Petitioner initially

answered that he did not, but then stated he had filed a grievance against Burgess that was still

pending, and that he still had complaints against his counsel.  (Tr. 2, 169-70.)  The jury was called

out, instructed on some additional matters, and excused to deliberate.  (Tr. 2, 171-72.)  At this time,

- 11 -

Petitioner asked the court why the jury was not given the transcript from the preliminary examination; the court responded that preliminary examination testimony was not evidence. (Tr. 2, 172.)

On August 10, 2000, after deliberating just under one hour, the jury returned with a verdict. (Tr. 2, 173.) The jury found Petitioner guilty of first-degree home invasion and aggravated stalking. (Tr. 2, 173.) They acquitted Petitioner on the felonious assault charge. (Tr. 2, 174.) On August 30, 2000, Petitioner was sentenced to a term of 10-20 years on the home invasion count and 40-60 months on the aggravated stalking count. (Sentencing Tr., 13, docket #23.)

### B.   Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. Attorney Douglas Baker was appointed to represent Petitioner on appeal and filed his appeal brief on July 2, 2001. In his brief, Petitioner raised grounds I (the trial court's "punishment" of Petitioner for requesting new counsel) and II (the admission of evidence of stalking activity on dates other than December 21, 1999) of his habeas application. In a supplemental brief filed *pro per* in January 2002, Petitioner raised ground III (ineffective assistance of trial counsel). By unpublished opinion issued on May 17, 2002, the Michigan Court of Appeals rejected all three arguments and affirmed Petitioner's convictions and sentences. (*See People v. McCrary*, No. 230907, 2002 WL 1010030, at *1-2 (Mich. Ct. App. May 17, 2002).) Petitioner filed a motion for reconsideration, which the Michigan Court of Appeals denied on July 22, 2002. (*See* Mich. Ct. App. No. 230907, docket #66.)

On September 16, 2002, Petitioner filed a delayed application for leave to appeal to the Michigan Supreme Court. In his initial application, Petitioner raised grounds I (the trial court's "punishment" of Petitioner for requesting new counsel) and II (the admission of evidence of stalking

activity on dates other than December 21, 1999).  (Mich. No. 122325, docket #68.)  In a September 26, 2002 *pro per* supplemental brief, Petitioner argued ground III (ineffective assistance of trial counsel), and moved the Michigan Supreme Court to remand to the trial court for a hearing on ineffective assistance of trial counsel before a new judge, pursuant to MICH. CT. R. 7.211(c)(I) and *People v. Ginther*, 212 N.W.2d 922 (Mich. 1973).  (Mich. No. 122325, docket ##71, 76.)  By order entered January 16, 2003, the Michigan Supreme Court denied Petitioner's application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (Mich. No. 122325, docket #77.)  In the same order, the Michigan Supreme Court denied Petitioner's motion for remand.  (*Id.*)

## Discussion

### A.    Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 791 (2001).  The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an

unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  This Court also may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the fact of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply.  *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir.), *cert. denied*, 124 S. Ct. 535 (2003).

A federal habeas court may not find a state adjudication to be unreasonable "simply because that court concludes in its independent judgment that the relevant state-court decision

applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699.  Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

**B.     Denial of Due Process - Trial Court's "Banning" of Further Plea Negotiations, "Forcing" a Trial, and Sentence**

As his first ground for habeas corpus relief, Petitioner maintains that the trial court deprived him of due process of law under the Fourteenth Amendment.  Specifically, Petitioner argues that the trial court "punished" him for requesting a new attorney by "banning" further plea offers, "forcing a trial," and sentencing Petitioner to a prison term that was four times longer than a deal the prosecution had offered him before trial.  (Pet. ¶¶ 5, 10; pp 8-13.)  At the May 31, 2000 motion hearing, the following exchange occurred:

PETITIONER:        Your Honor . . . [Petitioner's counsel] Mr. Noble here . . . he's been telling me all kinds of lies.  He hasn't been straight with me since day one.

COURT:               Name one.

* * *

- 15 -

PETITIONER:        Yesterday . . . he told me he talked to the Prosecutor, and they offered me a two and a half to five.

COURT:             They did.  That's not a lie; they did.

PETITIONER:        Okay; I told him I would accept that.  But then today he come and tell me I can't accept it?

COURT:             No.  Today the Prosecutor talked to the complainant.  The complainant said they would not go along with it.  So, he told you the truth.

*  *  *

PETITIONER:        – that ain't all.  That ain't all.

COURT:             Okay, give me another one.

*  *  *

PETITIONER:        I get a little nervous around authority figures, so . . .

COURT:             Well, I get a little nervous around criminals.  Now, tell me what lie did he tell?

PETITIONER:        Okay.  He told me first that he needed to check into everything but which he didn't.

COURT:             He did.

PETITIONER:        I'm just now getting my discovery, and I didn't even get all that.

COURT:             It went to him . . . The attorney has to try the case.  He has to know what the facts are.  The discovery --

PETITIONER:        He ain't been giving me no facts.

COURT:             All right.  Well, let's not waste any time.  Mr. Noble is not going to be forced against his will to represent you.  I'm not going to be forced against my will to sit here and listen to this nonsense.  So, I'm going to permit him to withdraw from the case.  We'll try this case on another date with another attorney.

PETITIONER:        Thank you.

- 16 -

COURT:              And I'll remember you.  Thank you.  Very good, Mr. Noble, thank you very much for your services.  You did what you were supposed to do.  You told him everything that was supposed to be told to him . . . Now, we have the opposite effect.  There were attorneys who were afraid to tell the attorneys (sic) about an offer.  Then after they got whacked at the trial they filed an appeal saying, "Well, my attorney didn't tell me about the deal I could have taken."  When you do tell them about the deal, then they claim the attorney's in cahoots with the prosecutor.  So, you get it one way or the other.  So, I'd rather not go through all this nonsense.  We'll just set a date.  We'll get somebody else on the matter, and we'll have a trial.

PETITIONER:         Also, I'd like to –

COURT:              You may be excused.  Thank you . . . [to Mr. Noble] It will go back over to your office, they can assign somebody . . . and we'll set a Final Conference, and we'll try the case.  There will be no offers.

MR. NOBLE:          Right.  Okay.

COURT:              Is that all right with you, Ms. Miller [Prosecutor]?

MS. MILLER:         Yes, your Honor.  Thank you.

COURT:              Very good.  I'm pleased, too.

                                     * * *

COURT:              Now I can understand why the complainant didn't want to go along with any offers.  I agree with them.

(Tr. V, 3-7.)  Petitioner maintains that in this pretrial exchange, the court punished him for

requesting a replacement for Mr. Noble by banning further plea negotiations and forcing a trial.

After Petitioner was convicted, the court sentenced Petitioner to 10-20 years and 40-60 months

concurrently.  He argues that this sentence, four times longer than the two and one- half to five years

offered him before trial, also amounts to a punishment by the court for requesting a new attorney.

              Petitioner raised ground I for the first time in the Michigan Court of Appeals. As a

result, the Court of Appeals expressly relied on Michigan's contemporaneous objection rule in

                                      - 17 -

denying Petitioner's claim.  The court noted that Petitioner failed to preserve this issue because he never raised it at the trial level via a motion to disqualify, a motion at sentencing, or a motion to vacate.  *McCrary*, 2002 WL 1010030, at * 1.  The court of appeals therefore reviewed the issue with a deferential standard, finding there was no plain error affecting Petitioner's substantial rights.  *Id*. The court specifically held that: (1) Petitioner's contention that the trial court had "banned" further plea negotiations mischaracterized the record because the trial court in fact merely indicated its approval of the prosecution's decision not to make any further plea offers[3]; (2) furthermore, the trial court's statements regarding plea negotiations were made before trial; (3) the trial record did not reveal any other incidents of impropriety or indication of bias by the trial court; and (4) the trial court did not base its sentence on any factor other than proper sentencing considerations.  *Id*.

When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107, 134-35 (1982).  The Sixth Circuit applies a four-part test to determine whether a claim is procedurally defaulted: (1) the court must first determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule; (2) the court must decide whether the state courts actually enforced the state procedural rule; (3) the default must be an "independent and adequate" state ground on which the state can rely to foreclose review of a federal constitutional

---

[3] Arguably, the court of appeals, not the Petitioner, mischaracterized the record.  The record could be read to hold that the trial court in fact did *not*, as the court of appeals found, merely approve a decision by the prosecution not to make any further plea offers. Rather, the record suggests that it was the trial court that first stated "[t]here will be no offers"; and then asked the prosecutor whether that was acceptable to her.  (Tr. 1, 6.)  However, even if the court did in fact prohibit plea negotiations, this does not implicate Petitioner's constitutional rights.  *See United States v. Sammons,* 918 F.2d 592, 601 (1990) (citing *Weatherford v. Bursey*, 429 U.S. 545, 561 (1977) (holding there is no constitutional right to plea negotiations)).

- 18 -

claim; and (4) if the foregoing are met, the petitioner must demonstrate cause for his failure to follow the rule and that he was actually prejudiced by the alleged constitutional error. *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001) (citing *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986)); *accord Lancaster*, 324 F.3d at 436-37; *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Patterson v. Haskins*, 316 F.3d 596, 604 (6th Cir. 2003). A state law procedural rule is adequate and independent when it was "firmly established and regularly followed" at the time of the asserted procedural default. *Rogers v. Howes*, 144 F.3d 990, 992 (6th Cir. 1998) (citing *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)).

There may be an "exceptional case in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question." *Lee v. Kemna*, 534 U.S. 362, 382 (2002). A petitioner may also excuse a default by making a colorable claim of innocence; that is, he has shown that any constitutional error "probably" resulted in the conviction of one who was actually innocent. *Schlup v. Delo*, 513 U.S. 298, 322 (1995) (citing *Murray v. Carrier*, 477 U.S. 478, 495 (1986)). This exception is reserved for a very narrow class of cases, based on a claim of "new reliable evidence." *Schlup*, 513 U.S. at 315, 324.

Petitioner's failure to comply with Michigan's contemporaneous objection rule constitutes an adequate ground for a procedural default. *See, e.g., Engle*, 456 U.S. at 129, 135. The Sixth Circuit has held that where the Michigan Court of Appeals finds that a defendant failed to preserve issues by raising them for the first time on appeal, the court has provided sufficient explanation that the standard of review it applied was based on procedural default. *Jackson v. Renico*, No. 04-1854, 2006 WL 1133285, at *6 (6th Cir. Apr. 27, 2006).

Although the Michigan Court of Appeals proceeded to review Petitioner's claim for plain error, in this circuit, "plain error review does not constitute a waiver of state procedural default rules." *Seymour v. Walker*, 224 F.3d 542 (6th Cir. 2000) (citations omitted); *Scott v. Mitchell*, 209 F.3d 854, 866-68 (6th Cir. 2000); *Atkins v. Phillips*, No. 00-1150, 2000 WL 1720719 (6th Cir. Nov. 8, 2000); *see also Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998) (state court's alternative holding on the merits does not require federal court to disregard the procedural bar); *McBee v. Abramajtys*, 929 F.2d 264, 267 (6th Cir.1991) (same); *Paprocki v. Foltz*, 869 F.2d 281, 284-85 (6th Cir. 1989) (claim is defaulted even where the state court may excuse the default for "manifest injustice"); *Federico v. Yukins*, No. 93-2424, 1994 WL 601408, at *3-4 (6th Cir. Nov. 2, 1994) (same, for "miscarriage of justice").

Because Petitioner failed to comply with the state's independent and adequate state procedural rule, *i.e.*, making a contemporaneous objection, he defaulted his claims in state court. *See Wainwright*, 433 U.S. at 87-88; *Lancaster*, 324 F.3d at 437; *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996).  When a petitioner has procedurally defaulted in the state courts, the federal habeas court will only entertain the defaulted issue if the petitioner can show "cause" for the procedural default and "actual prejudice" as a result of the alleged federal violation or can show actual innocence. *Engle,* 456 U.S. at 129; *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray*, 477 U.S. at 485; *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999).  To show cause sufficient to excuse a failure to raise claims on direct appeal, petitioner must point to "some objective factor external to the defense" that prevented him from raising the issue in his first appeal.  *Murray*, 477 U.S. at 488; *see McCleskey v. Zant*, 499 U.S. 467, 497 (1991).

In his "Objection to Respondent's Objection to Petitioner's Writ of Habeas Corpus," Petitioner argues for the first time cause and prejudice for his procedural default.  He argues that: (a)  he did not receive effective assistance of trial or appellate counsel because trial counsel failed to object to "the erroneous injection of the evidence," and appellate counsel "failed to raise the claim";  (b) he is "actually innocent of the charged offense"; (c) the trial court's errors were "the determining factor between guilt and innocence"; and/or (d) he has demonstrated a "miscarriage of justice."  Petitioner further argues, apparently in the alternative, that Michigan does not have a firmly-established contemporaneous objection rule.

To qualify as "cause" to excuse a procedural default, a claim of ineffective assistance of trial counsel must be exhausted.  *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Buell v. Mitchell*,  274 F.3d 337, 349 (6th Cir. 2001); *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001).   Petitioner raised ineffective assistance of trial counsel on direct appeal via *pro per* supplemental briefs to the state court of appeals and supreme court.  Therefore,  that claim is exhausted and could constitute cause for Petitioner's procedural default on ground I.  However, Petitioner cannot show he was actually prejudiced on ground I because there is no constitutional right to plea negotiations.  *See United States v. Sammons,* 918 F.2d 592, 601 (1990) (citing *Weatherford v. Bursey*, 429 U.S. 545, 561 (1977)).  Therefore, Petitioner has not been prejudiced by the trial court's suggestion at the May 2000 motion hearing that there be no more plea negotiations.  Additionally, the trial court sentenced Petitioner to terms that are well within the sentencing range of his convicted offenses; Petitioner does not argue otherwise, nor could he.

Petitioner's attempt to argue ineffective assistance of appellate counsel as "cause" for his procedural default on ground I is baseless.  Petitioner argues his appellate counsel was

- 21 -

ineffective because he "failed to raise the claim."  He does not explain the precise "claim" his appellate counsel purportedly failed to raise, and Petitioner's appellate counsel in fact did raise ground I on direct appeal.  *See McCrary*, 2002 WL 1010030, at *1-2.  Ineffective assistance of appellate counsel therefore cannot provide "cause" for his procedural default.

Because he has not shown ineffective assistance of appellate counsel sufficient to provide "cause" for his procedural default on issue I, Petitioner is not entitled to habeas relief on that basis.  Moreover, petitioner cannot show he was actually prejudiced on ground I, as set forth above.

Petitioner's contention that he is innocent of the charges on which he was convicted fails because he proffers no evidence whatsoever to support this claim.  Nor does he provide any support for his allegation that he has suffered a "miscarriage of justice."  He is therefore not entitled to habeas relief on ground I.

### C.   Denial of Due Process and the Right to Fair Notice of Charges: Admission of Evidence of Stalking Activity Throughout December 1999

As his second basis for relief, Petitioner maintains that the trial court erred in allowing certain testimony at trial, in violation of his Fourteenth Amendment right to due process of law and his Sixth Amendment right to fair notice of charges against him.  Specifically, Petitioner argues that the trial court should not have allowed the prosecution to introduce evidence of acts Petitioner had purportedly committed on dates other than December 21, 1999 – *i.e.*, that he had smashed the windows on complainant's car and that he had cut her telephone line multiple times– on the aggravated stalking charge.  (Pet. ¶ 10; pp 14-19.)  Petitioner argues that because only his acts on December 21, 1999 were referenced in the warrant, in the felony information, and at the preliminary examination, he had no notice that the prosecution would attempt to prove the aggravated stalking charge with evidence of acts that occurred on other dates.  (*Id.* at 14, 16.)  He

maintains that this omission denied him an opportunity to prepare an alibi defense for all of the alleged incidents. (*Id*. at 19.)  He further argues that the car window and phone line evidence could have prejudiced him on the home invasion charge in the eyes of the jury.  (*Id*. at 18.)

Petitioner raised ground II for the first time before the Michigan Court of Appeals. The court noted that under the state contemporaneous objection rule, he had therefore not preserved the argument. *McCrary,* 2002 WL 1010030, at *1.  It pointed out that Petitioner's  objection to the evidence did not allege that he lacked notice of the factual bases for the charges against him, or that he was unfairly surprised by the evidence. *Id.*  The court further pointed out that Petitioner had not, when he was in the trial court, requested a bill of particulars, moved for a continuance, or sought discovery on the evidence the prosecution planned to use in support of the aggravated stalking charge. *Id.*  The court of appeals concluded that there was no plain error affecting substantial rights because aggravated stalking by definition consists of more than one act, Petitioner had notice that he was charged with aggravated stalking, and, therefore, there was no basis to conclude that he did not have notice of the charges against him. *Id*. at *2.

As with ground I, Petitioner's failure to comply with Michigan's contemporaneous objection rule caused ground II to be procedurally defaulted.  As with ground I, Petitioner likewise cannot show cause or prejudice to overcome his procedural default on ground II.   Ineffective assistance of appellate counsel cannot serve as "cause" because appellate counsel  raised ground II on direct appeal. *See McCrary*, 2002 WL 1010030, at *1-2.  As with ground I, Petitioner presents no evidence that he is "actually innocent," or of the "miscarriage of justice" he has suffered on the aggravated stalking charge.

Nor can Petitioner show prejudice as to ground II to overcome his procedural default. At every stage of the proceedings, Petitioner was fully apprised that an aggravated stalking charge had been brought against him; and, therefore, of the elements of that offense.  He is not entitled to habeas relief on ground II.

### D.      Denial of Right to Effective Assistance of Trial Counsel

As his third basis for habeas corpus relief, Petitioner maintains that he was denied the effective assistance of counsel required by the Sixth Amendment because his trial attorney did not properly prepare for the case.   (Pet. ¶¶ 5, 6, 11; pp 20-24.)   He points out that his counsel waited six months from the time he was appointed to speak with Petitioner; and when he did, it was only in the two days before Petitioner's trial began on August 9, 2000.  (*Id*. at 23.)  Petitioner argues that, had his counsel begun investigating the case sooner, he would have discovered that Petitioner and complainant were going through a bitter divorce, and therefore complainant's allegations were the mere fabrications of an angry estranged spouse.  (*Id*. at 21-22, 24.)  He maintains that his counsel should have obtained and/or required the prosecutor to proffer more evidence, including police reports of the phone line cutting and car window breaking, fingerprints from complainant's house, and an invoice showing complainant's phone line had been cut and/or repaired.  (*Id*. at 22-24.)  Petitioner also contends that his attorney should have prevented the admission of testimony regarding the December 1999 phone-line and car-window incidents, because evidence of crimes for which a defendant has not been convicted is inadmissible.  (*Id*. at 22.)  He further maintains that his counsel should have obtained the names, report, and/or testimony of the two unidentified officers that "allegedly" first arrived at complainant's house on the morning of December 21, 1999, because

they purportedly "gave chase" to the real perpetrator and could have identified him or her.  (*Id*. at ¶ 6; p. 23.)

Petitioner argues that, in light of these omissions by his trial counsel, counsel was "absent" at a critical time in the proceedings, and was therefore ineffective under what Petitioner refers to as the clearly established "per se" ineffective assistance of counsel rule set forth in *United States v. Cronic*, 466 U.S. 648, 659 (1984) (holding that surrounding circumstances may in some cases justify a presumption of ineffectiveness, and a Sixth Amendment claim would in such a case be sufficient without an inquiry into counsel's actual performance at trial).  (Pet. pp 20-21.) Petitioner similarly argues that reversal in this case should be automatic under *Holloway v. Arkansas*, 435 U.S. 475, 489 (1978) (holding that prejudice was presumed, necessitating an automatic reversal of conviction, where trial court improperly required joint representation of three defendants, due to conflict of interest between them, over timely objection).  (*Id*. at 21.)  Finally, Petitioner argues that his attorney failed to investigate or make a reasonable decision not to investigate under *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  (*Id*. at 22.)

Petitioner raised ground III for the first time before the Michigan Court of Appeals. That court found that because Petitioner had not moved for a new trial or a hearing pursuant to *People v. Ginther*, 212 N.W. 2d 922 (Mich. 1973), its review was limited to "errors apparent from the record."  *McCrary*, 2002 WL 1010030, at *2.[4]  Applying the *Strickland* standard, the Court of Appeals held that to prevail on his claim for ineffective assistance of trial counsel, Petitioner had to show that trial counsel's performance "fell below the objective standard of reasonableness and

---

[4] Petitioner moved the Michigan Supreme Court to remand to the trial court for a hearing on ineffective assistance of trial counsel before a new judge, pursuant to court rule and *Ginther*.  The Michigan Supreme Court denied Petitioner's request on January 16, 2003.

that the representation so prejudiced him that he was denied the right to a fair trial." *Id*. (citation omitted.) To establish prejudice, the court held that Petitioner was required to show "a reasonable probability that but for counsel's error, the result of the proceedings would have been different." *Id*. (citation omitted.)   The court pointed out that Petitioner's trial counsel presented an alibi defense, called two witnesses to corroborate the alibi defense, argued that complainant's allegations were false, tried to show the shoe found at the scene did not belong to Petitioner, and cross-examined witnesses on the absence of broken glass around the basement window. *Id*. The Michigan Court of Appeals held that the record did not indicate that "counsel's performance fell below an objective standard or reasonableness"; and Petitioner failed to show that a further investigation by his counsel would have changed the outcome of the trial. *Id*. The court held that an evidentiary hearing was not necessary. *Id*.

Contrary to Petitioner's contentions, this case is distinct from both *Cronic* and *Holloway*, thus, it is not one in which ineffectiveness of counsel can be presumed. Rather, it is one requiring a review of Petitioner's trial counsel's performance under *Strickland*. Where a state court has found that a petitioner was not deprived of the effective assistance of counsel, this Court must determine whether the state court's decision was an unreasonable application of the *Strickland* standard. *Stewart v. Wolfenbarger,* __ F.3d __ , 2006 WL 3230286, at *9 (6th Cir. Nov. 9, 2006); *Barnes v. Elo*, 339 F.3d 496, 501-503 (6th Cir. 2003). *Strickland* requires a petitioner to prove two things to establish ineffective assistance of counsel: (1) counsel's performance was deficient; and (2) prejudice, that is, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 687, 694. In *Strickland,* the Supreme Court distinguished strategic choices made after a thorough investigation, which it deemed

- 26 -

"virtually unchallengeable," from strategic choices made after an incomplete investigation, which

must be scrutinized:

> strategic choices made after less than complete investigation are
> reasonable precisely to the extent that reasonable professional
> judgments support the limitations on investigation.  In other words,
> counsel has a duty to make reasonable investigations or to make a
> reasonable decision that makes particular investigations unnecessary
> . . . a particular decision not to investigate must be directly assessed
> for reasonableness in all the circumstances, applying a heavy measure
> of deference to counsel's judgments.

466 U.S. at 690-91.

Applying the above law, the Sixth Circuit recently granted habeas relief to a

petitioner based on his attorney's failure to investigate a potentially favorable witness, and to call

two alibi witnesses at trial.  *See Stewart*, 2006 WL 3230186, at *14-20.  In the failure-to-investigate

aspect of the *Stewart* case, trial witness "Simpson" testified that shortly before the victim was shot,

the petitioner ran into the house of "Williams" where Simpson was sitting, asked where the victim

was, and threatened to kill the victim.  2006 WL 3230286, at *14.  The petitioner told his attorney

that Williams was also present on the day in question, and could testify that neither Simpson nor the

petitioner were ever at Williams' house that day.  2006 WL 3230286, at *14-15.  The petitioner's

attorney never investigated Simpson's statement, nor did counsel ever contact Williams about his

testimony that might refute that of Simpson.  *Id.* The Sixth Circuit held counsel's decision not to

investigate Simpson's statement or Williams's potential testimony was "objectively deficient" under

*Strickland*, noting that: (1) Simpson was a "major" witness against the petitioner in that he testified

that the petitioner "threatened to kill the victim shortly before the victim was shot and killed"; (2)

even a superficial investigation would have lead counsel to Williams' house, which would have lead

to Williams and his potential favorable testimony; and (3) the petitioner specifically told his counsel

- 27 -

to subpoena Williams.  2006 WL 3230286, at *15.  The Sixth Circuit found neither a strategic purpose nor an excuse existed for counsel's failure to investigate Williams as a potential favorable witness, or his consequent failure to secure Williams' testimony on the petitioner's behalf.  *Id*.  The court held that, under *Strickland*, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 2006 WL 3230286, at *16 (citation omitted). The court ultimately found that counsel's failure to investigate Williams as a favorable witness and her failure to call two additional alibi witnesses "went to the very heart of [the] Petitioner's defense, namely, that when the crime was committed, he was not even in the state." *Id*.

This case is distinct from *Stewart* in several material respects.  First, it is not clear from the record whether or not Petitioner's counsel actually investigated the possibility that two officers arrived at the scene and chased the perpetrator away before Officers Chuney and Serra arrived, as petitioner contends.  But assuming he did not, such a decision would have been reasonable.  Here, unlike in *Stewart*, there is only a speculative possibility, not a *reasonable probability,* that, but for Petitioner's counsel's failure to investigate the existence of the purported first-responding officers, the outcome of Petitioner's trial would have been different. *See Strickland*, 466 U.S. at 694, *Stewart*, 2006 WL 3230186, at *16 (emphasis added).  Unlike witness Williams in *Stewart*, there is no certainty that the purported first-responding officers in the present case even exist.  There was no evidence that two officers had been at the scene before Officers Chuney and Serra, other than the second-hand testimony of that latter that complainant told them, when they arrived at about 6:20 a.m. on December 21, that two other officers had already been there. Complainant herself did not testify that four police officers had been to her house that morning, but

merely referred to the arrival of the "police."  (*See* Tr. 1, 95-97.)  Officers Chuney and Serra both testified that there was no record of two other officers having been there, and that no report had been filed on the incident other than theirs.  (*See* Tr. 2, 5-6, 22-23, docket #22.)  Petitioner acknowledges the uncertain existence of the officers in referring to them as "allegedly" having been at the scene. (Pet. ¶ 6.)  Given the purely speculative nature of the officers' existence, and necessity of their testimony, "reasonable professional judgment[s] support[s] " a decision by Petitioner's counsel not to expend resources to try to find officers that counsel could have reasonably believed did not exist and/or would not have provided testimony favorable to Petitioner.  *See Strickland*, 466 U.S. at 490-91.

Additionally, even if the two first-responding officers existed and had testified they saw someone other then Petitioner at the scene, there was nevertheless ample evidence to support the jury's finding that Petitioner was guilty beyond a reasonable doubt, including but not limited to, identification of Petitioner as the perpetrator by the victim and her daughter. Under all of the circumstances of this case, "applying a heavy measure of deference to counsel's judgments," a decision by Petitioner's counsel not to investigate the existence of two purported prior responding officers would have not been unreasonable.  *See Strickland*, 466 U.S. at 690-91.

In assessing Petitioner's ineffective assistance claim as a whole, the Court of Appeals properly applied the *Strickland* test, as applied in Michigan under a state supreme court case, requiring counsel's performance to fall "below an objective standard of reasonableness, and that the representation so prejudiced [Petitioner] that he was denied the right to a fair trial." *McCrary*, 2002 WL 1010030, at *2 (citing *People v. Pickens*, 521 N.W.2d 797 (Mich. 1994)).  Petitioner's attorney presented an alibi defense, called two witnesses to corroborate that defense, argued that

complainant's allegations were false, tried to show that the shoe found at the scene did not belong to Petitioner, and cross-examined witnesses on the absence of broken glass around the basement window. Petitioner's attorney also established, on his cross-examination of complainant, that she obtained a personal order of protection against Petitioner without presenting any evidence; and that complainant had proffered no documentary evidence to corroborate either her allegations that Petitioner cut her phone line numerous times, or that she had called the police when she had seen Petitioner lurking outside her house on other occasions. Petitioner's counsel cross-examined every witness regarding inconsistencies in their own testimony and with that of others. Accordingly, it was not unreasonable for the Michigan Court of Appeals to find that counsel's performance did not fall below an objective standard of reasonableness, or that counsel's representation so prejudiced Petitioner that he was denied the right to a fair trial. Finally, a petitioner's allegation that his counsel spent very little time with him is insufficient to state an ineffective assistance claim under *Strickland* without evidence of prejudice. *See Bowling v. Parker*, 344 F.3d 487, 506 (6th Cir. 2003). Given the foregoing, Petitioner's attorney's performance at trial did not fall below an objective standard of reasonableness; nor did it so prejudice Petitioner that he was denied the right to a fair trial. He is therefore not entitled to relief on ground III.

**Recommended Disposition**

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Dated:  November 22, 2006                    /s/ Hugh W. Brenneman, Jr.
                                             Hugh W. Brenneman, Jr.
                                             United States Magistrate Judge

**<u>NOTICE TO PARTIES</u>**

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).